IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROSEMARY AGUINIGA,

              Plaintiff,               No. CIV S-07-0324 EFB

     vs.

MICHAEL J. ASTRUE,          ORDER
Commissioner of Social Security,

              Defendant.

_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Income Benefits ("DIB") under Title II of the Social Security Act ("Act"), for the period from July 28, 2000, through September 17, 2002.  For the reasons that follow, plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the Clerk is directed to enter judgment for plaintiff.

**I.  BACKGROUND**

      Plaintiff, born October 16, 1955, initially applied for disability benefits on February 9, 2001, alleging disability since July 28, 2000, due to "carpal tunnel on both hands, tendinitis on right hand, fingers, hands, wrists and forearm pain."  Administrative Record ("AR") 54, 92-111.

////

1

1    The application was denied initially and upon reconsideration.  AR 55, 65-67.  On September

2    16, 2002, following a hearing before Administrative Law Judge ("ALJ") Antonio Acevedo-

3    Torres, plaintiff was found not disabled.[1]  AR 41-52.  Before that decision issued, plaintiff

4    reapplied for benefits on November 4, 2002.  AR 57-60.  That application was considered, and

5    the Agency determined that plaintiff was disabled as of September 17, 2002, based on a primary

6    diagnosis of systemic lupus erythematosus ("SLE").[2]  AR 54.  Thus, the issue as to the instant

7

8       [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
     Social Security program, 42 U.S.C. §§ 401, et seq.  Supplemental Security Income is paid to
9    disabled persons with low income.  42 U.S.C. §§ 1382, et seq.  Both provisions define disability,
     in part, as an "inability to engage in any substantial gainful activity" due to "a medically
10   determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) and
     1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under
11   both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; Bowen v.
     Yuckert, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

12

13            Step one:  Is the claimant engaging in substantial gainful
       activity?  If so, the claimant is found not disabled.  If not, proceed
       to step two.
14            Step two:  Does the claimant have a "severe" impairment?
       If so, proceed to step three.  If not, then a finding of not disabled is
15     appropriate.
              Step three:  Does the claimant's impairment or combination
16     of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
       404, Subpt. P, App.1?  If so, the claimant is automatically
17     determined disabled.  If not, proceed to step four.
              Step four:  Is the claimant capable of performing his past
18     work?  If so, the claimant is not disabled.  If not, proceed to step
       five.
19            Step five:  Does the claimant have the residual functional
       capacity to perform any other work?  If so, the claimant is not
20     disabled.  If not, the claimant is disabled.

21   Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

22       The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
23   evaluation process proceeds to step five.  Id.

24       [2]  Systemic lupus erythematosus is "a chronic, multisystem, inflammatory disorder of
     probable autoimmune etiology."  See Merck & Co., The Merck Manual of Diagnosis and
25   Therapy ("Merck Manual"), 266-67 (18th ed. 2006).  "Common manifestations include
     arthralgias and arthritis," and it can mimic other connective tissue disorders such as rheumatoid
26   arthritis.  Id.  "Arthralgia" means joint pain, especially that which is "inflammatory in character."

2

claim is whether plaintiff was disabled for the period from July 28, 2000, through September 17, 2002.

Plaintiff requested that the Appeals Council review the ALJ's September 16, 2002, decision.  AR 38-40; 82-83.  On September 3, 2004, the Appeals Council vacated that decision and remanded the case back to the ALJ for further proceedings.  AR 84-87.  Specifically, the Appeals Council found that the ALJ erred in assessing plaintiff's credibility relative to her subjective complaints, evaluating the opinions of her treating and examining physicians, and assessing the demands of her past relevant work with respect to her residual functional capacity.  *Id.*  The Appeals Council instructed the ALJ to reconsider the issue of whether plaintiff was disabled prior to September 17, 2002.  AR 87.

On April 6, 2005, a supplemental hearing was held before ALJ Acevedo-Torres.  AR 401-44.  In a decision dated May 20, 2005, the ALJ determined that plaintiff was not disabled from July 28, 2000, through September 17, 2002.  AR 12-25.  Specifically, the ALJ made the following findings:

> 1.   The claimant met the disability insured status requirements of the Act on July 28, 2000, the date the claimant stated she became unable to work, and continues to meet them through December 30, 2006.
>
> 2.   The claimant has not engaged in substantial gainful activity since her alleged onset date.
>
> 3.   The evidence supports a finding that during the pertinent period, July 28, 2000 to September 17, 2002, the claimant had a history of De Quervain's tendonitis of the dominant right wrist; left elbow lateral epicondylitis; slight carpal tunnel symptoms of the right hand; carpal tunnel symptoms on the left; lupus, unclassified systemic rheumatic disease characterized by positive ANA, elevated sedimentation rate, elevated immunoglobulins, joint pain, and fibromyalgia.  However, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

*Stedman's Medical Dictionary*, 149 (27th ed. 2000).

3

4.  Subjective complaints are considered credible only to the extent that they are supported by the evidence of record, as summarized in the text of this decision.

5.  The claimant has the retained residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  She can stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday and sit a total of six hours in an eight-hour workday.  She is precluded from climbing ladders, ropes and scaffolds.  She has manipulative limitations of no more than occasional use of her hands for manipulative activities.  (20 CFR 404.1520(e) .

6.  The claimant is unable to perform her past relevant work as a Clerk for the State of California, and an in-home service worker (20 CFR 404.1520(e) [*sic*].

7.  The claimant is 49 years of age, which is defined as a younger individual.

8.  The claimant has a high school education (20 CFR 404.1563, 404.1564).

9.  In view of claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

10. If the claimant's exertional capacity were for a full range of light work activities, and there were no nonexertional impairments, in consideration of such a capacity and her age, education and work experience, Guideline Rule 202.21 of the Medical-Vocational Guidelines of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion that the claimant is not disabled.

11. Considering the claimant's age, educational background and residual functional capacity she is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy.  Pursuant to the testimony of the vocational expert, these jobs include: (1) counter clerk, *Dictionary of Occupational Titles (DOT)* code 249.366-010, light exertion, SVP 2, unskilled work; (2) scaling machine operator *DOT* 521.685-386, light exertion, SVP 2; (3) bakery worker, *DOT* 524.687-022, light exertion, SVP 2; (4) election clerk, *DOT* 205.367-030, sedentary exertion, SVP 2; (5) children's attendant *DOT* 349.677-018, light, SVP 2; and (6) call-out operator, *DOT* 237.367-014, sedentary, SVP 2.

////

////

4

1
2

        12.     The claimant was not under a disability, as defined in the
                  Social Security Act, for the period of July 28, 2000 to
                  September 17, 2002. (20 CFR 404.1520(f) [*sic*].

3  AR 21-22.

4       On December 16, 2006, the Appeals Council denied plaintiff's request for review, and

5  the ALJ's decision became the final decision of the Commissioner.  AR 7-10.

6  **II.  ISSUES PRESENTED**

7       In her motion for summary judgment, plaintiff essentially alleges four errors in the

8  Commissioner's decision.  First, she alleges that the ALJ failed to consider a combination of all

9  plaintiff's impairments at step two of the sequential evaluation.  Second, she alleges that the

10  ALJ's residual functional capacity ("RFC") assessment is flawed in two ways:  (1) its failure to

11  reflect the opinion of plaintiff's treating physician, Dr. Kenneth Wiesner, M.D.; and (2) its

12  failure to account for plaintiff's improperly discredited subjective complaints.  Finally, plaintiff

13  alleges that the ALJ erred at step five of the sequential evaluation by failing to prove that other

14  work exists in the national economy that is within plaintiff's RFC.

15  **III.  LEGAL STANDARDS**

16       The Commissioner's decision that a claimant is not disabled will be upheld if the findings

17  of fact are supported by substantial evidence in the record and the proper legal standards were

18  applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

19  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*,

20  180 F.3d 1094, 1097 (9th Cir. 1999).

21       The findings of the Commissioner as to any fact, if supported by substantial evidence,

22  are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

23  more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

24  (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

25  support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

26  *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

1   "The ALJ is responsible for determining credibility, resolving conflicts in medical

2   testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

3   2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

4   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

5   *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

6   **IV.  ANALYSIS**

7          A.  <u>Step Two of the Sequential Evaluation</u>

8          "The step-two inquiry is a de minimis screening device to dispose of groundless claims."

9   *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  The purpose is to identify claimants

10  whose medical impairment is so slight that it is unlikely they would be disabled even if age,

11  education, and experience were taken into account.  *Bowen*, 482 U.S. at 153.

12         At step two of the sequential evaluation, the ALJ determines which of claimant's alleged

13  impairments are "severe" within the meaning of 20 C.F.R. § 404.1520(c).  A severe impairment

14  significantly limits a person's physical or mental ability to do basic work activities.  *Id.*  "An

15  impairment is not severe if it is merely 'a slight abnormality (or combination of slight

16  abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

17  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling ("SSR")

18  96-3p (1996)).

19         If a severe impairment exists, all medically determinable impairments must be considered

20  in the remaining steps of the sequential analysis.  20 C.F.R. § 404.1523.  The ALJ "must

21  consider the combined effect of all of the claimant's impairments on her ability to function,

22  without regard to whether each alone [i]s sufficiently severe."  *Smolen*, 80 F.3d at 1290; 20

23  C.F.R. § 404.1523.

24         Here, the ALJ did not set forth an explicit finding identifying which of plaintiff's alleged

25  impairments were "severe" at step two.  However, he specifically noted that it was "necessary to

26  establish whether the claimant has a 'severe' impairment or combination of impairments," and

6

1   that an "impairment is severe within the meaning of the regulations if it imposes significant

2   restrictions in the ability to perform basic work activities."  AR 16.  He then found that the:

3   > evidence supports a finding that during the pertinent period, the claimant had a
    > history of De Quervain's tendonitis of the dominant right wrist; left elbow lateral

4   > epicondylitis; slight carpal tunnel symptoms of the right hand; carpal tunnel
    > symptoms on the left; lupus, unclassified systemic rheumatic disease

5   > characterized by positive ANA, elevated sedimentation rate, elevated
    > immunoglobulins, joint pain, and fibromyalgia; *impairments which can cause*

6   > *significant vocationally relevant limitations*.

7   AR 16 (emphasis added).

8          Although the ALJ did not explicitly identify these as severe impairments at step two, that

9   finding is implicit based from the context of the ALJ's discussion of them.  Not only did the ALJ

10  predicate this finding with a discussion of the requirements of step two, he concluded by stating

11  that these impairments cause "significant vocationally relevant limitations," i.e., significant

12  limitations on plaintiff's ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).

13  Whether an impairment significantly limits a person's ability to do basic work activities is the

14  relevant finding for purposes of step two, and that was the finding made by the ALJ here.

15         Further, that plaintiff prevailed at step two is implied by the ALJ's findings and

16  conclusions with respect to the remaining steps of the sequential evaluation.  Although plaintiff

17  acknowledges that she prevailed at step two, she argues that the ALJ should have found her

18  fatigue – as well as all her other symptoms – "severe" at step two.  Plaintiff asserts that "[w]here

19  the effects of an impairment are not included in the severity analysis, there is no assurance that

20  they will have any role whatsoever in the determination of plaintiff's disability. . . ."  Pl.'s Mem.

21  in Supp. of Mot. for Summ. J. ("Pl.'s Br."), 13:17-19.

22         This argument ignores the function of step two as a gatekeeping mechanism to dispose of

23  groundless claims.  Once a plaintiff prevails at step two, regardless of which impairment is found

24  to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step

25  all other alleged impairments and symptoms that may impact her ability to work.  *See* 42 U.S.C.

26  § 423(d)(2)(B).  Again, plaintiff prevailed at step two.  Although the ALJ may have improperly

1   discounted or mischaracterized evidence of plaintiff's functional limitations throughout the

2   remaining steps of the sequential evaluation, as addressed below, this does not necessarily

3   constitute error at step two.  Rather, the question is whether the ALJ properly considered the

4   functional limitations of all medically determinable impairments at the remaining steps.  *See*

5   *Smolen*, 80 F.3d at 1290 (if one severe impairment exists, all medically determinable

6   impairments must be considered in the remaining steps of the sequential analysis) (citing 20

7   C.F.R. § 404.1523); *see Burch v. Barnhart*, 400 F.3d 676, 682-82 (9th Cir. 2005) (ALJ's failure

8   to find claimant's obesity severe at step two was harmless error where it was considered in

9   determining claimant's RFC).

10          B.  Steps Four and Five and the Evaluation of Medical Opinions and Testimony

11          Steps four and five of the analysis require a determination of the plaintiff's residual

12  capacity to perform work functions of her past work (step four) and, if unable to do so, other

13  work (step five).  Plaintiff argues that the ALJ failed to credit the opinion of her treating

14  physician and her testimony regarding her subjective complaints, and thereby erred in assessing

15  her residual functional capacity.  As discussed, the court agrees.

16              1.  Medical Opinions

17          The weight given to medical opinions depends in part on whether they are proffered by

18  treating, examining, or non-examining professionals.  *Lester*, 81 F.3d at 830.  Ordinarily, more

19  weight is given to the opinion of a treating professional, who has a greater opportunity to know

20  and observe the patient as an individual.  *Id.*; *Smolen*, 80 F.3d at 1285.

21          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

22  considering its source, the court considers whether (1) contradictory opinions are in the record;

23  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

24  treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81

25  F.3d at 831.  In contrast, a contradicted opinion of a treating or examining professional may be

26  rejected for "specific and legitimate" reasons, that are supported by substantial evidence.  *Id.*, at

8

1    830.  While a treating professional's opinion generally is accorded superior weight, if it is

2    contradicted by a supported examining professional's opinion (e.g., supported by different

3    independent clinical findings), the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d

4    1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

5    However, "[w]hen an examining physician relies on the same clinical findings as a treating

6    physician, but differs only in his or her conclusions, the conclusions of the examining physician

7    are not 'substantial evidence.'"  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

8           Here, the record reveals a host of medical opinions, each with slightly varying

9    assessments of plaintiff's functional limitations and each in marked contrast to the assessment of

10   the state agency physician.  However, the ALJ's ultimate determination of plaintiff's RFC

11   exactly reflects the October 1, 2001, opinion of non-examining, state agency physician Dr.

12   Antoine Dipsia, M.D.  AR 19, 276-83.  Specifically, the ALJ found plaintiff capable of lifting

13   and carrying twenty pounds occasionally and ten pounds frequently.  AR 19.  He found that she

14   could "stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday,"

15   could sit for six hours, but was precluded from climbing ladders, ropes and scaffolds.  *Id*.  He

16   further found that she "has manipulative limitations of no more than occasional use of her hands

17   for manipulative activities."  AR 19, 276-83.

18          That opinion is the least restrictive with respect to plaintiff's  functional limitations, and

19   differs in important ways from those offered by plaintiff's treating rheumatologist, Dr. Kenneth

20   B. Wiesner, M.D., and examining physicians Dr. John L. Branscum, M.D. and Dr. Carl W. Wolf,

21   M.D.

22          Although Dr. Wolf's opinion was based on an examination that occurred six months

23   beyond the relevant time period, it nonetheless acknowledges plaintiff's upper extremity

24   limitations.  AR 360-64.  Dr. Wolf examined plaintiff on March 7, 2003, and observed

25   diminished motor and grip strength in plaintiff's upper extremities, and opined that she could

26   only lift five pounds occasionally.  AR 363.

1    This is consistent with Dr. Branscum's opinion.  AR 335-44.  Dr. Branscum examined

2    plaintiff on August 27, 2001, and found that plaintiff had positive Phalen's, Tinel's and

3    Finkelstein's signs,[3] with a substantial loss of strength in both her right and left wrists.  He

4    further found "exquisite tenderness" around plaintiff's left elbow, and opined that plaintiff had

5    "lost 75% of grip strength bilaterally."  AR 343.  He opined that plaintiff's impairments and

6    resulting loss of strength limited her to simple manipulation, and that she had lost "75% of her

7    preinjury capacity for pushing, pulling, grasping, gripping, pinching, holding, torquing and

8    performing similar activities and activities requiring finger dexterity."  *Id.*

9    These opined limitations are markedly more restrictive than those reflected in Dr.

10   Dipsia's opinion.  In particular, a seventy-five percent reduction in plaintiff's ability to pull,

11   push, grip, grasp, and perform similar activities is not accounted for by a limitation of

12   "occasional use of both hands for" reaching, handling, and fingering.[4]  AR 279.

13   Significantly, Dr. Wiesner unequivocally endorsed Dr. Branscum's conclusions in an

14   opinion dated January 30, 2002.  AR 291.  He confirmed that plaintiff had positive Phalen's,

15   Tinel's and Finkelstein's signs, along with "subcutaneous atrophy and vitiligo over the radial

16   aspect of the wrist, where she has been injected."[5]  *Id.*  He further noted acute tenderness in

17   plaintiff's lateral epicondyle, and opined that "use of her upper extremities is very limited by

18   virtue of her loss of grip strength" in both hands.  *Id.*

19   Like Dr. Branscum, Dr. Wiesner opined limitations not just with respect to plaintiff's

20   manipulative functions, but for all activities involving her upper extremities.  Although Dr.

21

22   [3] Each of these are diagnostic tests for identifying carpal tunnel syndrome or De
Quervain's tenosynovitis, both of which cause pain, diminished strength, and limited range of
23   motion in the wrists.  *See* Merck Manual, at 334-36.

24   [4] "Occasionally" is defined as up to one-third of the workday.  *See* Social Security
Ruling ("SSR") 83-10.

25
26   [5] "Vitiligo" is a chronic skin condition that causes loss of pigmentation, the cause of
which, though unknown, has been linked to autoimmune disorders.  *See* Merck Manual, at 1002-
03.

1   Wiesner never completed a physical RFC assessment form, he repeatedly opined that plaintiff

2   was disabled and unable to maintain gainful employment due to her upper extremity

3   impairments, lupus and fibromyalgia.  *See, e.g.*, AR 285, 291, 353.

4           While "the treating physician's opinion on the ultimate issue of disability is not

5   necessarily conclusive," the ALJ still must give "clear and convincing" reasons for rejecting it.

6   *Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989).

7           Here, the ALJ gave "little evidentiary weight to the extreme findings of total disability

8   assessed by the claimant's treating physician, Dr. Wiesner."  AR 19.  The ALJ noted that the

9   "ultimate decision of disab[ility] is reserved to the Commissioner. . . and [that he was] not bound

10  to accept a treating physician's conclusion as to disability or functional capacity, particularly

11  when, as here, the opinion is not supported by detailed, clinical diagnostic evidence."  *Id.*  The

12  ALJ observed that "Dr. Wiesner did not cite objective findings that relate to functional

13  limitations and restrictions assessed; and his findings appear to be based solely upon the

14  claimant's recitation of her subjective complaints."  AR 20.

15          To the contrary, as noted above, Dr. Wiesner pointed to objective findings to support his

16  endorsement of Dr. Branscum's opinion – specifically, the positive Phalen's, Tinel's and

17  Finkelstein's signs.  AR 291, 289, 292, 294, 297, 357.  Further, during the relevant period Dr.

18  Wiesner diagnosed plaintiff with "left elbow epicondylitis, work-related, secondary to repetitive

19  trauma," De Quervain's tenosynovitis involving the right wrist, "secondary form of

20  fibromyalgia," "unclassified systemic rheumatic disease characterized by a positive ANA,

21  elevated sed rate, joint pain, sicca, and elevated immunoglobulins."  AR 244, 251.

22          Notably, the very diagnosis of plaintiff's rheumatic disease (later identified as SLE) is

23  supported by objective, clinical findings, namely, an elevated sedimentation rate, positive anti-

24  nuclear antibodies ("ANA"), sicca, and elevated immunoglobulins.  AR 285.  Each of these are

25  ////

26  ////

11

1   objective, clinical signs pointing to the existence of an autoimmune disorder.[6]

2          Further, the record shows that the other diagnoses were based on objective findings of

3   tenderness over the lateral epicondyle (AR 249, 250-51), extreme tenderness over the medial

4   epicondyle (AR 246), trigger point tenderness at chest wall, elbows, knees, ankles, and shins,

5   consistent with fibromyalgia (AR 244, 246, 252, 253, 297), dry eyes and mouth (AR 252), and

6   positive Tinel's and Finkelstein's signs (AR 289, 292, 294, 297, 357).

7          On August 2, 2002, Dr. Wiesner noted the "disabling features" of plaintiff's many

8   impairments, including her SLE, and opined that each condition presents its "own level of

9   disability."  AR 285.  He opined that plaintiff would not "be able to have gainful employment, at

10  least in the next few years, unless her elbow and wrist get better miraculously."  *Id.*  Again on

11  August 16, 2002, Dr. Wiesner noted the objective signs of plaintiff's SLE, and opined that this

12  condition, together with her epicondylitis, tenosynovitis, and fibromyalgia, made her "disabled

13  from gainful employment."  *Id.*  He further warned against repetitive use of her elbow and right

14  thumb/wrist.  *Id.*

15         While Dr. Wiesner's opinion is somewhat conclusory, it is not, as the ALJ concluded

16  "based solely upon the claimant's recitation of her subjective complaints."  AR 19-20.  Further,

17  while the ALJ noted Dr. Wiesner's comments in May 2001 that plaintiff needed a different type

18

19         [6] "Sedimentation rate" is the rate at which red blood cells precipitate in a period of 1
    hour.  It is "a non-specific measure of inflammation" and may indicate the presence of
20  "inflammatory diseases, such as rheumatoid arthritis and lupus."  *See* Mayo Clinic Staff,
    *Elevated sed rate: What does it mean*? (Feb. 23, 2008),
21  http://www.mayoclinic.com/health/sed-rate/HO00025.
            ANA are "anti-nuclear antibodies," which may be elevated in persons with autoimmune
22  diseases.  *See* Merck Manual, at 266-67 (noting that positive ANA tests can occur in persons
    with lupus, rheumatoid arthritis, connective tissue diseases, etc.).
23         Sicca, also known as Sjogren syndrome, is characterized by dryness of the eyes, mouth,
    and other mucous membranes.  It is a chronic, probably autoimmune disorder that can be
24  "primary or secondary to other autoimmune disorders," such as lupus.  *See* Merck Manual, at
    264.
25         Elevations of certain classes of immunoglobulins (antibodies) may indicate the presence
    of an autoimmune disorder.  *See* James N. Gilliam, Don E. Cheatum, Eric R. Hurd, Peter Stastny,
26  and Morris Ziff, *Immunoglobulin in Clinically Uninvolved Skin in Systemic Lupus
    Erythematosus* (May 1974), http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=302631.

of employment, he ignored Dr. Wiesner's later opinions, which consistently indicated that he believed plaintiff was precluded from gainful employment altogether.  AR 289, 286, 353, 355.

Moreover, the record belies the ALJ's conclusion that Dr. Wiesner's findings were "not consistent with the findings in the other evidence of record."  AR 20.  Specifically, Dr. Wiesner's findings are largely consistent with those of Dr. Branscum, who, after examining plaintiff concluded that she had lost "75% of her preinjury capacity for pushing, pulling, grasping, gripping, pinching, holding, torquing and performing similar activities and activities requiring finger dexterity."  AR 343.  Both doctors assessed significant limitations caused by plaintiff's impairments, and while unlike Dr. Wiesner, Dr. Branscum did not indicate a complete preclusion from work, his findings do indicate a *substantial* reduction in plaintiff's ability to perform work activities using her upper extremities.  Despite this, the ALJ glossed over Dr. Branscum's conclusions (even though they were shared by plaintiff's treating rheumatologist), and mischaracterized them as "essentially consistent" with the ALJ's conclusion that plaintiff was capable of "performing a significant range of light [work]."  AR 20, 22.

"Light work" requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  SSR 83-10.  "A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work. . . ."  *Id.*  "'Frequent' means occurring from one-third to two-thirds of the time."  *Id.*  "To be considered capable of performing a full or wide range of light work, you must have the ability to do *substantially all* of these activities."  20 C.F.R. § 404.1567(b) (emphasis added).

Dr. Branscum's opined limitations essentially preclude plaintiff from light work, and only the non-examining state agency physician found plaintiff capable of performing a significant range of light work.  *See Lester*, 81 F.3d at 831 (the opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional).  In light of the contradictions between the state agency physician's

opinion and those of Drs. Wiesner and Branscum, the ALJ was required to at least give specific

and legitimate reasons for rejecting or ignoring them.  The mischaracterization of the record as

set forth above is neither specific and legitimate nor clear and convincing.  Accordingly, the

court finds error in the ALJ's treatment of the medical opinions in the record, and by extension,

with his assessment of plaintiff's RFC.

### 2. Credibility Determination

The ALJ's credibility determination was similarly flawed.  The ALJ determines whether

a disability applicant is credible, and the court defers to the ALJ's discretion if the ALJ used the

proper process and provided proper reasons.  *See, e.g., Saelee v. Chater*, 94 F.3d 520, 522 (9th

Cir. 1995).  If credibility is critical, the ALJ must make an explicit credibility finding.  *Albalos v.*

*Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th

Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for

the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider

objective medical evidence and then consider other factors.  *Bunnell v. Sullivan*, 947 F.2d 341,

344 (9th Cir. 1991) (en banc).  If there is objective medical evidence of an impairment, the ALJ

then may consider the nature of the symptoms alleged, including aggravating factors,

medication, treatment and functional restrictions.  *Id.*, at 345-47.  The ALJ also may consider:

(1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent

testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment, and (3) the applicant's daily activities.  *Orn v. Astrue*, 495 F.3d

625, 636 (9th Cir. 2007); *Smolen*, 80 F.3d at 1284.

"Without affirmative evidence showing that the claimant is malingering, the

Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing."

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

////

1    Here, the ALJ found that plaintiff's "allegations as to multiple symptoms and limitations,

2  [were] exaggerated and thus less than fully credible, and . . . [were not] supported by the weight

3  of the medical evidence." AR 21. The ALJ wrote that "[p]rior to September 17, 2002, there is . .

4  . a lack of medical documentation of an impairment which would cause extreme pain or pain

5  which would significantly compromise the claimant's ability to perform work-related activities."

6  AR 21. This statement completely ignores the medical evidence discussed above, which

7  indicates the presence of several impairments – epicondylitis, De Quervain's tenosynovitis

8  involving the right wrist, SLE and fibromyalgia – all of which caused plaintiff pain and/or

9  significantly impaired her ability to grasp, grip, pull push, and hold objects. *See, e.g.,* AR 332-

10  33, 343, 244, 246, 249, 252, 253, 297, 289, 292, 294, 297, 357.

11    Further, the ALJ's observation that "the record does not document ongoing significant

12  objective evidence of muscle atrophy, deconditioning or muscle weakness" is inapposite. AR

13  21. The record contains relevant evidence indicating substantial losses in strength and in

14  plaintiff's ability to hold, push, pull, grasp and grip objects. *See* AR 343. The ALJ cites no

15  authority demonstrating that plaintiff's impairments should typically produce "muscle atrophy"

16  or "deconditioning" rather than the limitations described above.

17    The ALJ also discredits plaintiff because "there is no indication that the claimant's

18  treating source has ever recommended any treatment other than physical therapy, anti-

19  inflammatory, pain medications and splinting of her wrists. . . . Surgery has not been suggested,

20  and the claimant has not been referred to a pain clinic or a specialist." AR 21.

21    To the contrary, Dr. Wiesner referred plaintiff to specialist Dr. James A. Lilla, M.D., at

22  Hand Surgery Associates in Sacramento. The record shows that she received an injection from

23  Dr. Lilla in 1999, but that the relief did not last after she returned to work. AR 253. Dr. Wiesner

24  noted the injection and remarked that surgery may be indicated given the chronic nature of

25  plaintiff's wrist condition. *Id.* The record shows that on May 24, 2001, Dr. Lilla discussed

26  surgery with plaintiff, and advised her that although it was feasible on the "left first extensor

15

1   compartment," there was no guarantee that it would resolve her problems, especially in light of

2   her underlying connective tissue disorder (i.e., SLE).  AR 195.  Thus, contrary to the ALJ's

3   characterization of the record, plaintiff was referred to a specialist, and surgery was suggested,

4   although it was ultimately decided against in light of likely complications and worsening related

5   to her SLE.  These mischaracterizations of the record do not constitute clear and convincing

6   reasons for discrediting plaintiff.  *Morgan*, 169 F.3d at 599.

7           "Where the ALJ improperly rejects the claimant's testimony regarding [her] limitations,

8   and the claimant would be disabled if [her] testimony were credited, we will not remand solely to

9   allow the ALJ to make specific findings regarding that testimony."  *Lester*, 81 F.3d at 834

10   (quoting *Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)

11   (internal quotations omitted).  "Rather, that testimony is credited as a matter of law."  *Id.*

12   Similarly, "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion

13   of a treating or examining physician, we credit that opinion as a matter of law."  *Id.* (quoting

14   *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989)) (internal quotations omitted); *see also*

15   *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990) (remanding for payment of benefits where

16   Secretary did not provide adequate reasons for disregarding examining physician's opinion).

17           Here, plaintiff testified that as a result of her impairments, she could not sit without

18   having to shift from side to side, and that she felt constantly tired and in pain.  AR 411, 413.  She

19   testified that she had significant restrictions in her upper extremities, and that she had difficulty

20   in, for example, lifting clothes out of the dryer.  AR 426.  She testified that she could only lift

21   small objects, and could no longer, for example, pick up or carry a half gallon of milk.  AR 410.

22           This testimony is largely consistent with the opinions of Drs. Branscum and Wiesner – an

23   examining physician and treating physician, respectively – which were improperly rejected or

24   mischaracterized by the ALJ.  By crediting those opinions and plaintiff's testimony as a matter

25   of law, it is clear that plaintiff was unable to engage in substantial gainful activity during the

26   relevant period.  Accordingly, the court will not address the other alleged errors at step five, and

will not remand for further findings because "no useful purpose would be served by further administrative proceedings." *Varney*, 859 F.2d at 1399; s*ee also Pitzer*, 908 F.2d at 506 (the decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court).

**V. CONCLUSION**

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for immediate payment of benefits.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted;

2. The Commissioner's cross motion for summary judgment is denied; and,

3. This action is remanded to the Commissioner for immediate payment of benefits. The Clerk is directed to enter judgment for plaintiff.

DATED:  September 17, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE